**Marcella R. MAYFIELD,**
**Plaintiff-Appellant,**

v.

**METROPOLITAN LIFE INSURANCE CO., Defendant-Respondent.**■

No. 10855.

Missouri Court of Appeals,
Southern District,
Division Three.

July 24, 1979.

Motion for Rehearing or to Transfer
Denied Aug. 27, 1979.

Application to Transfer Denied
Oct. 10, 1979.

**164**

W. H. Winchester, III, Blanton, Rice, Sickal, Gilmore & Winchester, Sikeston, for plaintiff-appellant.

John L. Oliver, Jr., Oliver, Oliver & Jones, P. C., Cape Girardeau, for defendant-respondent.

FLANIGAN, Chief Judge.

Plaintiff Marcella R. Mayfield brought this action against defendant Metropolitan Life Insurance Company for the "double indemnity benefit" contained in an insurance policy issued by defendant on the life of Loomis Mayfield. Plaintiff, the beneficiary named in the policy, is the widow of the insured. The cause was submitted to a jury which returned a verdict in favor of defendant. Plaintiff appeals.

■ Plaintiff's first "point relied on" reads: "The verdict and judgment were contrary to and against the weight of the evidence and contrary to the law under the evidence." This point preserves nothing for appellate review for it violates Rule 84.-04(d) [1] in failing to state "briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous." Similar statements have been held to be defective. See *Wombles v. General Am. Life Ins. Co.*, 541 S.W.2d 45, 46 (Mo.App. 1976); *Stokes v. Kelly*, 537 S.W.2d 562 (Mo. App.1976); *Barber v. M. F. A. Milling Company*, 536 S.W.2d 208, 211[13] (Mo.App. 1976); *Davis v. Schott*, 508 S.W.2d 193 (Mo.App.1974); *Bowers v. Spinaio*, 421 S.W.2d 790, 792[3] (Mo.App.1967); *State v. Koch*, 272 S.W.2d 22, 25[2] (Mo.App.1954).

■ Whether a jury verdict is against the weight of the evidence is a question for the trial court alone. *Wilcox v. Coons*,362 Mo. 381, 241 S.W.2d 907, 917[25] (1951). "The statement that the verdict is against the greater weight of the credible evidence presents nothing for review because appellate courts do not weigh the evidence in a case tried before a jury." *State ex rel. State Highway Commission v. Twin Lakes*

---

1. Unless otherwise indicated, all references to rules are to Missouri Rules of Court, V.A.M.R.

*Golf Club, Inc.*, 470 S.W.2d 313, 315[3] (Mo. 1971). See also *Neavill v. Klemp*, 427 S.W.2d 446, 449[13] (Mo.1968); *Homeyer v. Wyandotte Chemical Corp.*, 421 S.W.2d 306, 309[3] (Mo.1967).

Plaintiff advances three additional "points relied on," which will be considered together for the reason that each of them attacks the propriety of Instruction No. 3, given at the request of the defendant. One of these points also challenges the propriety of Instruction No. 4. Each of the challenged instructions is set forth below.[2]

Plaintiff's criticisms of Instruction No. 3 include the charge that it is confusing and misleading. Plaintiff challenges Instruction No. 4 on the ground that it "should have been modified to place the burden of proof upon defendant to cause the jury to believe the propositions necessary to support the claims set out in Instruction No. 3."

On October 30, 1974, Loomis Mayfield was admitted to the Missouri Delta Community Hospital at Sikeston, Missouri. The diagnosis on admission was "acute diverticulitis." The initial treatment consisted of medication and bed rest. The attending physician was Fred Thornton, M.D. In the early morning hours of November 3, 1974, Dr. Thornton performed surgery consisting of an exploratory laparotomy and colostomy.

During the course of the surgery Loomis was anesthetized and an endotracheal tube was inserted. The tube, according to Dr. Thornton, "allows the anesthetist to breathe for the patient while he is paralyzed." Dr. Thornton testified that the use of the tube was "an essential part of the surgical treatment." Following the surgery Loomis, with the tube still intact, was transferred to the intensive care unit.

At 4:30 p. m. on November 3, 1974, while Loomis was in the intensive care unit, the tube became dislodged from his trachea. Several minutes passed before the tube could be "reinstated." During those minutes, the parties stipulated, there was "an inadequate supply of oxygen to the blood which led to the brain of Loomis." The parties further stipulated: "The hypoxic episode and resultant cerebral edema and cerebral necrosis were the direct and proximate result of a lack of oxygen when the endotracheal tube became dislodged."

Immediately following the tube dislodgement Loomis became comatose and remained in that condition until his death. On November 12, 1974, he was transferred to Baptist Memorial Hospital in Memphis, Tennessee, where he remained until his death on January 6, 1975. An autopsy was performed by Marvin P. Meadors, M.D., a pathologist.

The only oral evidence was introduced by plaintiff and it consisted of the testimony of Pamela Allred, who was the "medicine nurse" in the intensive care unit, and the testimony of Dr. Thornton. Mrs. Allred described the tube dislodgement incident.

---

2.     " 'Instruction No. 3

Your verdict must be for Defendant if you believe:
FIRST: Loomis F. Mayfield died either
(1) From disease, or,
(2) From infection of any nature, or,
(3) Resulted from medical or surgical treatment and
SECOND: That Loomis F. Mayfield's death was the direct result of any one or more of the conditions referred to in Paragraph First.'
Not in MAI. Submitted by Defendant."
     " 'Instruction No. 4
In these instructions you are told that your verdict depends on whether or not you believe

certain propositions submitted to you. In determining whether or not you believe any proposition, you must consider only the evidence and the reasonable inferences derived from the evidence. The burden is upon plaintiff to cause you to believe the propositions necessary to support her claim against defendant. If the evidence in the case does not cause you to believe a particular proposition submitted or if you are unable to form a belief as to any such proposition, then you cannot return a verdict requiring belief of that proposition.'
MAI 3.01—Submitted by Plaintiff."

It was her testimony that the tube was out of place for approximately 15 minutes. She said she did not know "how the tube came out—no one knows."

Dr. Thornton testified that the tube was inserted at the start of the surgery and was left in place when Loomis was taken to the intensive care unit. After Loomis was placed in that unit, Dr. Thornton "saw him frequently during the course of the day and he seemed to be doing well, making a rather standard recovery." At 4:45 p. m., minutes after the dislodgement had occurred, Dr. Thornton was notified of the incident and "got there as quickly as I could and reinserted the tube." On the doctor's arrival Loomis's "color was black, he was markedly cyanotic and his heartbeat was 14 per minute the normal being about 80." After the tube was reinserted Loomis was breathing but he was unconscious.

Dr. Thornton testified that the dislodgement of the tube "was not a part of my prescribed treatment." Dr. Thornton interpreted the autopsy report to mean "that the final cause, the thing that really killed Loomis, was the pseudomonas septicemia, and he had gotten this because he was unprotected with his necrosis of the brain or death of the brain."

Dr. Thornton also testified that in his opinion Loomis died "as a result of his cerebral cortical necrosis and complications that resulted therefrom—the proximate cause of the cerebral cortical necrosis was the hypoxic episode that occurred when the tube was dislodged." The witness defined the term "hypoxic episode" as "the length of time he went without oxygen."

Dr. Thornton also testified, in essence, that in his opinion Loomis would have survived if the tube had not dislodged.

The material provisions of the insurance policy read:

## "DOUBLE INDEMNITY BENEFIT

The Company will pay to the Beneficiary, subject to the provisions of this policy, an additional sum equal to $5,000, upon receipt of due proof that the death of the Insured occurred, while this benefit is in effect, as the result, directly and independently of all other causes, of bodily injury caused solely by external, violent, and accidental means.

Risks Not Covered—Such additional amount will not be payable if the Insured's death:

.      .      .      .      .

(b) is caused or contributed to, directly or indirectly, by disease or bodily or mental infirmity, even though in such case bodily injury caused solely by external, violent, and accidental means is the proximate cause of death;

(c) is caused or contributed to, directly or indirectly, by infection of any nature, except septic infection incurred through an external visible wound sustained through external, violent, and accidental means;

(d) results, directly or indirectly, from medical or surgical treatment."

The parties assign different labels to Instruction No. 3. *Plaintiff* takes the position that Instruction No. 3 is an affirmative defense instruction based, at least in part, on a policy exclusion. Plaintiff cites *Gennari v. Prudential Insurance Co. of America*, 335 S.W.2d 55 (Mo.1960). In that case an action was brought on an insurance policy which provided for a double indemnity benefit payable for death by accidental means. The defendant pleaded that the insured's death resulted from disease. The policy contained a clause to the effect that the double indemnity benefit was not payable if the death resulted "directly or indirectly from bodily or mental infirmity or disease in any form." The supreme court said, at 61, that an allegation by the defendant that the death resulted from disease "is not the allegation of an affirmative defense and the burden thereon does not rest upon the defendant." The court also said that the "clause in the policy relative to death from bodily or mental infirmities

or disease *is not an exception* to the general liability clause governing double indemnity and *is*, as the St. Louis Court of Appeals viewed it, essentially *a redundant statement.*" (Emphasis added.)

Plaintiff states that, under *Gennari*, the "disease" ground in Instruction No. 3 is not an exclusion and that possibly the same is true with respect to the "infection" ground contained in that instruction. Plaintiff argues, however, that the "medical or surgical treatment" ground of Instruction No. 3 "is a true exception to the general liability clause" and, as such, is an affirmative defense.

Plaintiff then argues that Instruction No. 4 is erroneous because it violated the Notes on Use under MAI 3.01 in that it failed to inform the jury that the burden was on the defendant with respect to the matters submitted in Instruction No. 3. Plaintiff relies on *Arnel v. Roettgen*, 530 S.W.2d 20 (Mo. App.1975) where the court held, in a personal injury action, that the burden of proof instruction was erroneous in omitting to tell the jury that the burden was on the defendant with respect to the affirmative defense of contributory negligence and rejected the defendant's contention that the plaintiff invited the error by preparing and submitting the erroneous burden of proof instruction. The court in *Arnel* said, at 23, "Error in failure to comply with MAI 3.01 should not be judged on the basis of who submitted the defective instruction, but rather on the basis of whether the error is prejudicial." The court held the error to be a prejudicial one.

At one place in its brief *defendant* refers to Instruction No. 3 as "an affirmative de-fense instruction or an affirmative converse instruction." Later in its brief defendant, arguing that Instruction No. 3 is "a pure MAI 33.05 affirmative converse" instruction, relies on *Restaurant Industries, Inc. v. Lum's, Inc.*, 495 S.W.2d 668 (Mo.App.1973) for the proposition that it is not error for the trial court to fail to modify MAI 3.01 to tell the jury that the burden was on defendant to cause the jury to believe the proposition necessary to support defendant's affirmative converse, also called a Third Method Converse, instruction.

It is unnecessary to rule whether Instruction No. 3 is an affirmative defense instruction or is an affirmative converse instruction.[3] If that portion of Instruction No. 3 dealing with "medical or surgical treatment" is an affirmative defense, based on a policy exclusion, the burden was on defendant to prove the facts which would make the policy exclusion applicable. *Mission Insurance Company v. Ward*, 487 S.W.2d 449, 451[3] (Mo. banc 1972).

If it be assumed, arguendo, that Instruction No. 3 is, as defendant at times claims it to be, an affirmative converse instruction, defendant's use of it "carries with it the risk of nonpersuasion" [Notes on Use—MAI 33.05], and it is at least arguable that it does not follow the format of MAI 33.05. In addition, plaintiff's assertion that Instruction No. 3 is confusing and misleading has some merit.

Instruction No. 3 presents the three enumerated grounds disjunctively. Looking only at the third ground, paragraph FIRST reads: "Loomis F. Mayfield died resulted from medical or surgical treatment." The preparer of the instruction probably intend-

---

**3.** For a definition of an "affirmative converse" instruction see *Morris v. Klein*, 400 S.W.2d 461, 465 (Mo.App.1966). For a discussion of what constitutes "an affirmative defense" see *Semo Grain Co. v. Oliver Farms, Inc.*, 530 S.W.2d 256, 258 (Mo.App.1975).

See "Converse Instructions Under MAI," 42 Mo.L.Rev. 175 (Spring 1977), an excellent article written by Prof. Elwood L. Thomas. At pp. 200–206 the author discusses the affirmative converse instruction. He points out that MAI No. 1.03 prohibits the use of a sole cause instruction and says, at 203: "However, any affirmative converse instructions, which are authorized by MAI 33.05, run a high risk of being sole cause instruction." The author closes with the admonition, "Do not use the affirmative converse instruction."

ed that portion of the instruction to mean, "the death of Loomis F. Mayfield resulted from medical or surgical treatment," but even if that benevolent construction be placed upon it, paragraph SECOND may add confusion when it is applied to the third ground. With respect to the third ground paragraph FIRST requires a belief that the death resulted from medical or surgical treatment and paragraph SECOND requires that the death be the direct result. To say the least, the dual requirement of result, one "direct" and one undescribed, lacks clarity.

■ The matters touched upon in the preceding paragraph are neither pursued nor ruled for the reason that this court holds that Instruction No. 3 was prejudicially erroneous in that there was no evidentiary support for the proposition set forth in it that the death of Loomis directly [4] resulted from medical or surgical treatment.

Defendant asserts that *plaintiff's* [5] evidence furnishes support for the proposition that the death of Loomis directly resulted from medical or surgical treatment. Defendant refers to the evidence concerning the use of the endotracheal tube and the incident involving its dislodgement. Defendant argues that the use of the tube was "medical or surgical treatment" and indeed such was the testimony of Dr. Thornton. However, Dr. Thornton also pointed out that the *dislodgement* of the tube was *not* a part of his treatment.

Defendant's excellent brief cites cases involving accident insurance policies containing similar exclusions with respect to medical or surgical treatment. The cited cases are: *McKay v. Bankers Life Co.*, 187 N.W.2d 736 (Iowa 1971); *Wilson v. Travelers Ins. Co.*, 29 A.D.2d 312, 287 N.Y.S.2d 781 (1968); *Provident Life & Acc. Ins. Co. v. Hutson*, 305 S.W.2d 837 (Tex.Civ.App.1957); *Wilson v. Business Men's Assur. Co. of America*, 181 F.2d 88 (9th Cir. 1950); *Pitman v. Commercial Travelers Eastern Acc. Ass'n.*, 284 Mass. 467, 188 N.E. 241 (1933); *Westmoreland v. Preferred Accident Insurance Co.*, 75 F. 244 (5th Cir. 1896). These authorities are not controlling.

In *McKay*, while performing a biopsy on the insured, the physician severed a blood vessel. "Profuse bleeding resulted which caused" the death. In *Wilson v. Travelers Ins. Co.*, during the administration of anesthesia, an increase in the pressure in the veins caused the brain to swell and push down against a tumor. The sudden pressure resulted in a depression of respiration and an insufficient amount of oxygen to sustain the action of the heart. In *Provident*, during the performance of a pneumoencephalogram, a brain stem tumor was caused to hemorrhage, resulting in death. In *Wilson v. Business Men's*, a two-to-one opinion, the death of the insured resulted "from an embolism which was brought about by the 'extraordinarily violent coughing, choking and snoring of the insured resulting unforeseeably from the routine administration of opiates and sedatives incident to the operation.'" In *Pitman* the operating surgeon used a contaminated instrument which fatally infected the insured. In *Westmoreland* "the patient—in part at least, according to plaintiff's petition—died from" the administration of chloroform.

---

**4.** Note that paragraph SECOND of Instruction No. 3, as applied to medical or surgical treatment, requires that the death of Loomis was the direct result of medical or surgical treatment. Paragraph (d) of the policy, set forth earlier in the opinion, eliminated coverage if the death resulted "directly or indirectly" from medical or surgical treatment.

**5.** Dr. Thornton testified for the plaintiff. In cross-examining Dr. Thornton defendant's counsel sought to elicit testimony *minimizing* the significance of the episode involving the tube dislodgement. The cross-examination emphasized that the incident affected the cortical portion of the brain rather than the medullary portion and that the latter controlled breathing. The doctor informed counsel that his line of questioning was creating the impression that after the incident Loomis "had a normal respiratory system because his medulla was okay" but the doctor stated that "in fact he did not."

In each of the foregoing cases the *administration* of treatment played the fatal role. In the case at bar the evidence, if believed by the jury, supported a finding that the *cessation* of treatment, occasioned by the dislodgement, was the death-producing factor. There is no evidence to show that the dislodgement of the tube inflicted a physical injury. It was merely a matter of the tube, upon dislodgement, no longer performing its beneficial function.

Instruction No. 3, so *defendant* asserts, requires a direct causal connection between treatment and death. That requirement is not met by evidence showing a direct causal connection between lack of treatment, or mere interruption of treatment, and death. A requirement of direct causal connection between treatment and death (or fatal injury) is not satisfied by a mere showing that the death or injury occurred *during* treatment. Causal relationship, rather than mere time relationship, must be shown.[6]

If a person were receiving respiratory sustenance from an oxygen tent, and the tent quit functioning because of a power failure due to an act of God, the resultant death would be attributable to the act of God but it would not be accurate to say that the death resulted from treatment. It is no answer to say that in the hypothetical instance there was no negligence while here there may have been negligence on the part of the hospital authorities in failing to supervise the patient to see that the tube remained in its proper place. Neither Instruction No. 3 nor the policy speaks in terms of the defendant being exonerated by reason of negligence (active or passive) on the part of the hospital. The proposition in the instruction is that the defendant is relieved from payment because death was caused by treatment. The trial court erred in giving Instruction No. 3 because it lacked evidentiary support.

This appeal does not involve the question of the sufficiency of plaintiff's evidence to bring the circumstances within the provisions of the insuring clause of the policy. Defendant has not raised that issue, if such it be, and this opinion does not address it.

The judgment is reversed and the cause remanded.

BILLINGS, MAUS and GREENE, JJ., concur.

6. "Considering this record, there is no evidence from which any jury could have found as a fact that Brand's hernia caused the pricking of his artery. Such a verdict would have been as far-fetched as to find that, had the ceiling fallen while he lay strapped to the operating table, the hernia that brought him to the table caused or contributed to the injury produced by the falling plaster." *Aetna Life Ins. Co. v. Brand*, 265 F. 6, 7 (2nd Cir. 1920).

In *Reid v. Aetna Life Ins. Co.*, 440 F.Supp. 1182 (1977), affirmed w/o opinion, 588 F.2d 835 (7 Cir. 1978), the court stated a hypothetical case of a mad man shooting a patient undergoing medical or surgical treatment. The court said, "It may be conceded that the mere fact that medical or surgical treatment is going on at the time does not preclude liability for such an accidental death; but quite obviously in such cases the death could not be said to have been as a consequence of the medical treatment."