## SEYMOUR HAMMER *v.* LUMBERMAN'S MUTUAL CASUALTY COMPANY
## (13780)

HEALEY, SHEA, CALLAHAN, COVELLO and HENNESSY, Js.

Argued January 2—decision released April 17, 1990

*Wesley W. Horton,* with whom were *Jeffrey A. Hoberman* and *Louis W. Flynn, Jr.,* for the appellant (plaintiff).

*Barbara B. Sacks,* for the appellee (defendant).

ARTHUR H. HEALEY, J. The plaintiff, Seymour Hammer, brought an action against the defendant, Lumberman's Mutual Casualty Company, for its alleged failure to continue to provide lifetime disability payments in accordance with the terms of the group disability insurance policy issued to the plaintiff by the defendant. The defendant moved for summary judgment on the basis of an exclusion in the policy that limits benefits to two years if the total disability was caused by or resulted from "medical or surgical treatment." In granting the defendant's motion for summary judgment, the trial court held, inter alia, that the plaintiff's disability resulted from medical or surgical treatment; thus, it denied the plaintiff lifetime disability benefits under the policy. From this judgment, the plaintiff appealed to the Appellate Court, and, pursuant to Practice Book § 4023, we transferred the case to this court.

The pleadings, affidavit and other documentary information presented to the trial court on the motion for summary judgment reveal the following undisputed facts. On August 18, 1981, the plaintiff entered Mount Sinai Hospital for treatment of a stomach ulcer condition. As part of his treatment, the plaintiff's physician ordered a total parenteral nutrition (TPN) line to be installed. On August 28, 1981, the plaintiff was found in the bathroom area of his hospital room in a semi-

conscious state with his TPN line disconnected. As a result of this incident, complications arose that led ultimately to the plaintiff's total disability. The plaintiff brought suit against Mount Sinai Hospital and several physicians alleging, inter alia, that their negligence and carelessness in the course of treating the plaintiff for his ulcer condition caused his injuries and disability.[1]

At the time of the plaintiff's total disability, the plaintiff was insured by a group disability insurance policy issued to him by the defendant on July 1, 1980. Shortly after August 28, 1981, the date the plaintiff was found in a semiconscious condition, the defendant commenced paying monthly disability benefits in accordance with this policy in the amount of $1500 per month and continued to pay disability benefits until October 4, 1983. In his amended complaint, the plaintiff alleged that the defendant had failed to continue to pay monthly disability payments in accordance with the terms of the insurance policy. Specifically, the plaintiff claimed that the defendant had an obligation under the policy to continue to make disability payments so long as the plaintiff remained disabled.

On December 30, 1988, the defendant moved for summary judgment. In its motion, the defendant claimed that the plaintiff's total disability was caused by or resulted from "medical or surgical treatment," and therefore his benefits, under the terms of the policy, are limited to those provided for under the "sickness" provision.[2] In support of its motion, the defendant attached a copy of the insurance policy, the plaintiff's responses to the defendant's requests to

[1] On August 23, 1989, the jury returned a verdict in *Hammer* v. *Mount Sinai Hospital*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV 830286323 S, in favor of the plaintiff against Mount Sinai Hospital and Douglas Whittemore, a physician, in the amount of $460,000. That judgment is now on appeal.

[2] See footnote 4, infra.

admit, a copy of the plaintiff's complaint filed in *Hammer* v. *Mount Sinai Hospital,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV 830286323 S (August 23, 1989), and a memorandum of law. In opposition to the defendant's motion, the plaintiff filed an affidavit from David Bronster, a physician, and a memorandum of law.

On June 8, 1989, the trial court granted the defendant's motion. In granting the motion, the court rejected the plaintiff's claim that, based on the affidavit of Bronster, the event that occurred on August 28, 1981, "was of a complicated nature and was a highly unusual and unforeseen result of the installation of the [TPN line] and that such result must therefore be termed 'accidental' giving rise to an issue of material fact which can only be resolved at the time of trial." The court stated that "[t]he plaintiff ha[d] not produced any documents to contest the defendant's contention that the plaintiff's disability result[ed] from the installation of the TPN line which in turn was part of his treatment for his ulcer condition."

The court further stated that the language in the insurance policy, "medical or surgical treatment," was unambiguous. In so doing, it cited J. Appleman, Insurance Law and Practice § 415, which provides: " 'The expression "medical and surgical treatment" when used in the contract, includes all acts done by a physician in the preliminary care, general treatment or later care in order to effect a cure. . . . ' " Moreover, the court, in recognizing that our courts had not had occasion to pass upon this question, noted that other jurisdictions had applied similar exclusionary provisions to various mishaps which had occurred during the course of medical treatment, citing *Whetsell* v. *Mutual Life Ins. Co. of New York,* 669 F.2d 955 (4th Cir. 1982), and cases cited therein.

In conclusion, the court held that the "alleged negligent installation of the TPN line in connection with the plaintiff's treatment for a stomach ulcer constituted 'medical or surgical treatment' and thus the disability resulting therefrom is covered by the 'sickness' provisions of the policy." In addition, the court stated that "[s]ince the defendant has paid the plaintiff for that period called for by such provision of the policy, i.e., two years, it has satisfied its obligation to him."

On appeal, the plaintiff contends that the trial court erred in (1) granting the defendant's motion for summary judgment because there existed a genuine issue of fact, and (2) concluding that the exclusionary provision, medical or surgical treatment, applies to improper medical treatment.

I

The plaintiff first contends that the trial court erred in granting summary judgment because there existed a genuine issue of fact, i.e., whether the plaintiff's total disability was caused by or resulted from "medical or surgical treatment." He maintains that Bronster's affidavit, filed by him in opposition to the defendant's motion for summary judgment, presented evidence that his injury was "accidental in nature." He asserts that it was a material question of fact whether his injury was the result of medical or surgical treatment or was the unforeseen result of his reaction to the insertion of the TPN line. The defendant contends, however, that the court properly granted its motion for summary judgment for two reasons: (1) the plaintiff failed to present any evidence to the trial court to contest the defendant's claim that the plaintiff's disability resulted from the installation of the TPN line which in turn was part of his treatment for his ulcer condition; and (2) the plaintiff is estopped from relitigating the cause of

his disability because he is bound by the favorable judgment he received in the medical malpractice suit filed against Mount Sinai Hospital, which, we note, is presently on appeal. We conclude that the trial court did not err in granting the defendant's motion because the plaintiff failed to present evidence in opposition to the defendant's contention that the plaintiff's disability was caused by medical or surgical treatment. Because we agree with the defendant's first claim, we do not address the defendant's second claim.

"Our standard of review of a trial court's decision to grant a motion for summary judgment is well established." *Zichichi* v. *Middlesex Memorial Hospital,* 204 Conn. 399, 402, 528 A.2d 805 (1987). Practice Book § 384 provides that summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See also *Zichichi* v. *Middlesex Memorial Hospital,* supra; *Catz* v. *Rubenstein,* 201 Conn. 39, 48, 513 A.2d 98 (1986); *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 568, 512 A.2d 893 (1986). " 'A "material" fact has been defined adequately and simply as a fact which will make a difference in the result of the case.' *United Oil Co.* v. *Urban Redevelopment Commission,* [158 Conn. 364, 379, 260 A.2d 596 (1969)]." *Catz* v. *Rubenstein,* supra. "The test is whether a party would be entitled to a directed verdict on the same facts." *State* v. *Goggin,* 208 Conn. 606, 616, 546 A.2d 250 (1988).

"Once the moving party has presented evidence in support of the motion for summary judgment, the opposing party must present evidence that demonstrates the existence of some disputed factual issue . . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed

issue. 'Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § 380.' *Bartha* v. *Waterbury House Wrecking Co.*, [190 Conn. 8, 12, 459 A.2d 115 (1983)]. 'The movant has the burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of fact does exist.' *Kasowitz* v. *Mutual Construction Co.*, 154 Conn. 607, 613, 228 A.2d 149 (1967), quoting *Boyce* v. *Merchants Fire Ins. Co.*, 204 F. Sup. 311, 314 (D. Conn. 1962) . . . ." *Burns* v. *Hartford Hospital*, 192 Conn. 451, 455, 472 A.2d 1257 (1984); *Daily* v. *New Britain Machine Co.*, supra, 568–69. "To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . which contradict those stated in the movant's affidavits and documents." *State* v. *Goggin*, supra, 616–17.

In support of its motion for summary judgment, the defendant filed a copy of the insurance policy, the plaintiff's responses to the defendant's requests to admit, a copy of the plaintiff's complaint filed in *Hammer* v. *Mount Sinai Hospital*, supra, and a memorandum of law. These documents alleged that the plaintiff's total disability was caused by the negligent installation and maintenance of the TPN line which was installed as part of the plaintiff's treatment for his ulcer condition. Among the plaintiff's answers to the defendant's requests to admit, the plaintiff admitted that "Plaintiff's physicians at Mt. Sinai Hospital ordered, *as part of the treatment for plaintiff's ulcer condition,* that a Total Parenteral Nutrition Line be installed." (Emphasis added.) We also note that, in the plaintiff's answers to the defendant's requests to admit, the plaintiff admitted that he had alleged "that the cause of [his] prob-

lem was emboli which occurred as a result of the improper installation of said [TPN] Line or the maintenance of that device . . . ."

In opposition to the defendant's motion for summary judgment, the plaintiff presented Bronster's affidavit and a memorandum of law. In the affidavit, Bronster stated, inter alia, that while the plaintiff was in the hospital for his ulcer condition, "a resident physician at Mt. Sinai Hospital in Hartford, Connecticut administered an intravenous device called a Total Parenteral Nutrition Line to [the plaintiff's] right chest and shoulder area with reported considerable difficulty causing substantial pain and anxiety to the [plaintiff]. As a result of this incident, [the plaintiff] suffered an incident wherein the distribution of certain blood vessels in his brain became infarcted thereby causing him to sustain diverse neurologic signs and symptoms . . . . As a result of this injury, the Plaintiff remains totally disabled."

The plaintiff, in arguing and presenting documentary evidence that his total disability was caused by an accident, did not raise a material issue of fact that would have made a difference in the result of the case and consequently would have defeated the defendant's motion for summary judgment. The factor that was dispositive on the defendant's motion for summary judgment was whether the plaintiff's total disability was caused by or resulted from "medical or surgical treatment." As will be discussed later in this opinion, the exclusion of medical or surgical treatment applies only if the insured's total disability was caused by an accident. In arguing that the exclusion applies to the plaintiff, the defendant, in effect, conceded that the plaintiff's total disability was caused by an accident. It was not enough for the plaintiff, in order to defeat the defendant's motion, merely to show that his total

disability was caused by an accident. To have raised an issue of material fact to the trial court, some evidence showing the existence of an issue of material fact must have been presented in the counteraffidavit. As the trial court found, the plaintiff failed to present such evidence, which was necessary to overcome the defendant's contention that his total disability was caused by or resulted from "medical or surgical treatment."[3]

---

[3] The plaintiff relies on *Mayfield* v. *Metropolitan Life Ins. Co.,* 585 S.W.2d 163 (Mo. App. 1979), for support of his contention that the trial court erred in granting the motion for summary judgment because an issue of material fact existed. We find *Mayfield* v. *Metropolitan Life Ins. Co.,* supra, inapposite. In that case, the plaintiff appealed to the Missouri Court of Appeals from a jury verdict in favor of the defendant. Id., 164. The plaintiff brought an action against the defendant for the "double indemnity benefit" contained in an insurance policy issued by the defendant on the life of Loomis Mayfield, the plaintiff's husband. Loomis Mayfield underwent surgery for an exploratory laparotomy and colostomy. Id., 165. During the course of the surgery, Loomis was anesthetized and an endotracheal tube was inserted. After surgery, Loomis was transferred to the intensive care unit with the tube still intact. Soon after Loomis was in that unit, the tube became dislodged. Immediately following the tube dislodgement, Loomis became comatose and remained in that condition until his death. Id.

The trial court, in instructing the jury, stated that "[y]our verdict must be for the Defendant if you believe . . . That Loomis F. Mayfield's death was the *direct result* of any one or more of the conditions referred to in Paragraph First." (Emphasis added.) Id., 165 n.2. Paragraph First referred to medical or surgical treatment. The Court of Appeals held that this instruction was "prejudicially erroneous in that there was no evidentiary support for the proposition set forth in it that the death of Loomis directly resulted from medical or surgical treatment." Id., 168. The policy at issue in *Mayfield* eliminated coverage if the death resulted "directly or indirectly" from medical or surgical treatment. Id., 166. The court, in referring to several cases that have applied a similar exclusion, stated: "In each of the foregoing cases the *administration* of treatment played the fatal role. In the case at bar the evidence, if believed by the jury, supported a finding that the *cessation* of treatment, occasioned by the dislodgement, was the death-producing factor. There is no evidence to show that the dislodgement of the tube inflicted a physical injury. It was merely a matter of the tube, upon dislodgement, no longer performing its beneficial function." Id., 169.

This case is inapposite to the present case. The court in *Mayfield* noted that there was no evidence to support the trial court's instruction that Loomis' death directly resulted from medical or surgical treatment. Con-

We conclude that there was no issue of material fact presented to the trial court and, thus, the court properly granted the defendant's motion for summary judgment. "Where the character of a death or injury sustained in connection with medical treatment is determinable from evidence permitting only one conclusion, no submissible case exists." 10 G. Couch, Insurance (Rhodes 2d Ed.) § 41:127.

## II

The plaintiff next contends that the trial court erred in concluding that the exclusionary provision applies to improper medical treatment. Specifically, the plaintiff contends that the trial court erred in (1) finding the exclusionary provision, medical or surgical treatment, unambiguous, and (2) relying on *Whetsell* v. *Mutual Life Ins. Co. of New York,* supra, to support its decision. We are not persuaded by the plaintiff's arguments.

The plaintiff maintains that the term "medical or surgical treatment" is ambiguous because it allows for two reasonable constructions. The plaintiff asserts in his brief that "[o]ne construction is that all medical or surgical treatment, no matter how skillfully or unskillfully performed, is covered by that phrase." Thus, the plaintiff continues, "patently negligent treatment, such as amputating the wrong leg, would be included within the ambit of this term." The second construction, which the plaintiff's brief states is "equally reasonable," "is that improper treatment, or malpractice, which is an accident, is not included within the meaning of that phrase." The plaintiff contends, therefore, that because there are two reasonable constructions of the phrase "medical or surgical treatment," the phrase is ambiguous and, thus, in accordance with familiar principles, should be construed in favor of the plaintiff.

trary to *Mayfield,* the trial court in the present case was presented with evidence that the plaintiff's total disability did result from medical or surgical treatment as set out in this opinion.

The defendant, on the other hand, contends that the language in the policy is clear and unambiguous. The defendant asserts that there are no words in the policy that require a distinction between "proper and improper" medical treatment. It maintains that the phrase "medical or surgical treatment" applies to any and all treatment. The defendant claims that the policy does not differentiate between the "quality of treatment or whether disability results from negligent medical treatment or from unforeseen consequences of 'proper' treatment."

"It is the function of the court to construe the provisions of the contract of insurance." *Gottesman* v. *Aetna Ins. Co.,* 177 Conn. 631, 634, 418 A.2d 944 (1979). We recently noted in *Schultz* v. *Hartford Fire Ins. Co.,* 213 Conn. 696, 702, 569 A.2d 1131 (1990): "An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy. *Izzo* v. *Colonial Penn Ins. Co.,* 203 Conn. 305, 309, 524 A.2d 641 (1987); *Griswold* v. *Union Labor Life Ins. Co.,* 186 Conn. 507, 512–13, 442 A.2d 920 (1982); *Gottesman* v. *Aetna Ins. Co.,* [supra]." " ' "The determinative question is the intent of the parties, that is, what coverage the . . . [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy." *Marcolini* v. *Allstate Ins. Co.,* 160 Conn. 280, 283, 278 A.2d 796 [1971]. . . .' " *Griswold* v. *Union Labor Life Ins. Co.,* supra. If the words in the policy "are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." *Plainville* v. *Travelers Indem-*

*nity Co.,* 178 Conn. 664, 675, 425 A.2d 131 (1979). "If the 'insurance coverage is defined in terms that are ambiguous, such ambiguity is . . . resolved against the insurance company. "Where the terms of the policy are of doubtful meaning, the construction most favorable to the insured will be adopted." *LaBonte* v. *Federal Mutual Ins. Co.,* 159 Conn. 252, 256, 268 A.2d 663 (1970); see also *Griswold* v. *Union Labor Life Ins. Co.,* [supra]; *Simses* v. *North America Co. for Life & Health Ins.,* 175 Conn. 77, 84–85, 394 A.2d 710 (1978).' *Beach* v. *Middlesex Mutual Assurance Co.,* 205 Conn. 246, 250, 532 A.2d 1297 (1987)." *Schultz* v. *Hartford Fire Ins. Co.,* supra. However, " '[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings.' *Downs* v. *National Casualty Co.,* 146 Conn. 490, 494–95, 152 A.2d 316 (1959)." Id., 703. We conclude that the exclusion "medical or surgical treatment" is unambiguous. "Given [the] natural and ordinary meaning, [it] express[es] the intent of the parties." *Marcolini* v. *Allstate Ins. Co.,* supra, 284; see *A. M. Larson Co.* v. *Lawlor Ins. Agency, Inc.,* 153 Conn. 618, 622, 220 A.2d 32 (1966).

A disability insurance policy insures "against the inability to pursue a livelihood arising either from accident or illness." 1 J. Appleman, Insurance Law and Practice § 23. The disability insurance policy[4] in this

---

[4] The group disability insurance policy provides in part:
"GROUP DISABILITY INSURANCE CERTIFICATE

LUMBERMENS MUTUAL CASUALTY COMPANY
A mutual insurance company, herein called the Company

Long Grove, IL 60049

NOTICE: SEE EXCLUSION ENDORSEMENT INCLUDED HEREIN

HEREBY CERTIFIES that the Person (herein individually called the Insured) named in the Schedule of Benefits (hereinafter called the Schedule) is insured under and subject to all the exceptions, conditions, limita-

appeal insures against total disability resulting from or caused by accident and sickness. Part I of the "Bene-

tions and other terms of the group policy identified in the Schedule, said policy having been issued to the Holder named in the Schedule.

PERTINENT PROVISIONS OF THE GROUP POLICY

DEFINITIONS

'Injury' shall mean bodily injury caused by an accident occurring while the Policy is in force as to the Insured.

'Sickness' shall mean sickness or disease which causes a period of disability, such disability commencing while the Policy is in force as to the Insured.

'Total Disability' shall mean disability wholly and continuously preventing the Insured from performing the duties of his occupation but in no event shall 'Total Disability' commence more than fifteen days before the earliest date during such disability on which the Insured received regular care and attendance of a legally qualified physician other than the Insured, nor shall it continue unless the Insured thereafter receives regular care of such physician; provided that in no event shall 'Total Disability' exist for any purpose of the Policy during any period in which the Insured is engaged in the duties of his occupation, nor shall 'Total Disability' exist for any purpose of the Policy following a five year period for which benefits are payable, if the Insured is not wholly and continuously disabled by reason of Injury or Sickness from engaging in any occupation or employment for wage or profit for which he is qualified or becomes qualified by reason of his education, training or experience.

'Regular care and attendance of a legally qualified physician other than the Insured' shall mean a planned program of observation and treatment by such physician which, once initiated, is continued to the extent that observation and treatment is necessary under existing standards and customs of medical practice for the condition causing disability.

ELIGIBILITY AND EFFECTIVE DATE OF ELIGIBLE PERSON'S INSURANCE

Evidence of insurability satisfactory and acceptable to the Company must be furnished without expense to the Company.

In the event the insurance of an Insured is terminated by reason of section (f) of INDIVIDUAL TERMINATIONS, such person shall be qualified for insurance, without evidence of insurability, identical to that which was in force immediately prior to such termination, provided such person makes written application for insurance within sixty days after again becoming an Eligible Person.

Insurance hereunder with respect to an Eligible Person shall become effective on the date specified by the Company, provided that such person is an Eligible Person on such date, and provided further that if any Eligible Person is prevented by physical or mental impairment form actively performing the full-time duties of his occupation on the date immediately preceding the date on which insurance would otherwise become effective, insurance shall become effective on the date such physical or mental impair-

fits" section of the policy is entitled, "Monthly Accident Indemnity." Part I provides a lifetime indemnity

ment is no longer disabling. The effective date of the insurance hereunder with respect to each Insured will be subject to the payment of the appropriate premium as stated in the Schedule.

BENEFITS

PART I—MONTHLY ACCIDENT INDEMNITY

If Total Disability of the Insured due to Injury commences while the Policy is in force as to the Insured, the Company will pay periodically the Monthly Indemnity stated in the Schedule applicable to the Insured for each month (one-thirtieth of the monthly indemnity rate for each day of any period less than one month) throughout which such Total Disability continues beyond the Elimination Period for Accident as stated in the Schedule applicable to the Insured, but not to exceed the Indemnity Period Limit for Accident stated in the Schedule applicable to the Insured for any one period of Total Disability.

If a period of Total Disability commencing while the Policy is in force as to the Insured results from causes which are the same as, or related to, the causes of any prior period of the Total Disability with respect to which Monthly Indemnity has been payable under this Part I, the subsequent period shall be considered as a continuation of the prior period for all purposes of this Part I but in no event shall the benefits payable for such subsequent periods of disability exceed in the aggregate the Indemnity Period Limit for Sickness as stated in the Schedule applicable to the Insured.

Monthly Indemnity will not be payable under this Part I while the Insured is receiving indemnity as provided in Part II of the Policy, or during any continuous period of Total Disability due to Sickness immediately following the expiration of the Indemnity Period Limit for Sickness as stated in the Schedule applicable to the Insured.

For the purposes of this Part I any period of Total Disability caused by or resulting from (1) disease or medical or surgical treatment therefor, (2) infection other than pus-forming infection sustained through an accidental cut or wound, or (3) hernia of any kind, however caused, shall be considered as disability from Sickness, subject to the provisions in Part II.

PART II—MONTHLY SICKNESS INDEMNITY

If Sickness results in Total Disability of the Insured, the Company will pay periodically the Monthly Indemnity specified in the Schedule applicable to the Insured for each month (one-thirtieth of the Monthly Indemnity rate for each day of any period less than one month) throughout which such Total Disability continues beyond the Elimination Period for Sickness, as stated in the Schedule applicable to the Insured, but not to exceed the Indemnity Period Limit for Sickness as stated in the Schedule applicable to the Insured for any one period of Total Disability. In no event, however, will the Monthly Indemnity be payable under this Part II beyond the Insured's seventy-second birthday anniversary.

period for "Total Disability . . . due to injury."[5] Injury is defined in the definition section of the policy

If a period of Total Disability commencing while the Policy is in force as to the Insured results from causes which are the same as, or related to, the causes of any prior period of Total Disability with respect to which Monthly Indemnity has been payable under this Part II, the subsequent period shall be considered as a continuation of the prior period for all purposes of this Part II unless the Insured has engaged in all the duties of his occupation or has been capable of engaging therein, for at least six full months between such periods of Total Disability.

Monthly Indemnity will not be payable under this Part II while the Insured is receiving indemnity as provided in Part I of the Policy.

PART III—WAIVER OF PREMIUM

Upon due proof that Total Disability of the Insured for which indemnity is payable under the Policy has continued for six months while the Policy is in force as to such Insured, the Company will waive the payment of any premium of such Insured becoming due during any further continuous period of Total Disability for which Indemnity is payable and the Policy shall remain in force as to the Insured during such further period, subject to the provisions of INDIVIDUAL TERMINATIONS except as to the payment of premium.

INDIVIDUAL TERMINATIONS

The insurance of any Insured shall immediately terminate; (a) on the date the Policy is terminated; (b) on the date the Insured retires or ceases to be actively engaged in the duties of his occupation unless cessation of the Insured's engaging in such occupation is due to Total Disability; (c) on the date the Insured ceases to be a member of the Merchants & Employees Regional Insurance Trust; (d) on the premium due date coinciding with or first following the Insured's seventieth birthday anniversary; (e) on the expiration of the grace period, if the Insured fails to make the required premium payment; or (f) on his becoming a full-time Member of the armed services of any country, except for temporary duty of thirty days or less. The Company will refund premium pro rata upon request for any period for which coverage is not afforded by reason of this provision. Termination of the insurance of any Insured shall be without prejudice to any claim of such Insured for a period of disability commencing prior thereto.

INDIVIDUAL CERTIFICATES

This provision in the Group Policy, not contained in this Certificate, relates to the fact that an individual Certificate will be issued to each Insured."

[5] The schedule of benefits provides:

| Total Disability | "Monthly Indemnity | Indemnity Period Limit | Elimination Period |
|---|---|---|---|
| Accident | $1,500 | Lifetime | 30 Days |
| Sickness | $1,500 . | 2 Years | 30 Days" |

as "bodily injury caused by an *accident* occurring while the Policy is in force as to the Insured." (Emphasis added.) Part I further provides: "For the purposes of this Part I any period of Total Disability caused by or resulting from (1) disease or *medical or surgical treatment* therefor, (2) infection other than pus-forming infection sustained through an accidental cut or wound, or (3) hernia of any kind, however caused, shall be considered as disability from Sickness, subject to the provisions in Part II." (Emphasis added.) Part II of the "Benefits" section in the policy is entitled "Monthly Sickness Indemnity." This provision provides benefits for two years for total disability resulting from sickness. Sickness is defined in the policy as "sickness or disease which causes a period of disability, such disability commencing while the Policy is in force as to the Insured."

The focus of the plaintiff's claim of error is on the exclusionary provision in Part I of the "Benefits" section, specifically, that part of the provision that excludes from lifetime disability benefits total disability "caused by or resulting from . . . medical or surgical treatment.

"Provisions in insurance policies excepting particular losses from the coverage thereof are ordinarily valid, for the parties to a contract of insurance have the right to limit or qualify the extent of the insurer's liability in any manner not inconsistent with statutory forms or provisions or contrary to public policy. And an insurance company may exclude from coverage death [or disability] caused by any particular accident . . . ." 10 G. Couch, supra, § 41:378. "The reason for or purpose of an exclusion clause in a policy is to eliminate from coverage specified losses . . . which except for the exclusion clause would remain under the coverage." Id., § 41:380. "In an insurance policy, an exclusion is a provision which eliminates coverage where, were it not for the exclusion, coverage would have existed."

*Kansas-Nebraska Natural Gas Co.* v. *Hawkeye-Security Ins. Co.*, 195 Neb. 658, 664, 240 N.W.2d 28 (1976); *Modern Sounds & Systems, Inc.* v. *Federated Mutual Ins. Co.*, 200 Neb. 46, 50, 262 N.W.2d 183 (1978); *Bortz* v. *Merrimac Mutual Ins. Co.*, 92 Wis. 2d 865, 871, 286 N.W.2d 16 (1979); see also 3 R. Long, Law of Liability Insurance § 17.15. "[T]he word 'exclusion' signifies subject matter or circumstances in which the insurance company will not assume liability for a specific risk or hazard that otherwise would be included within the general scope of the policy. See Keeton, Basic Text of Insurance Law 307 (1971)." *Ideal Mutual Ins. Co.* v. *Lucas*, 593 F. Sup. 466, 468 (N.D. Ga. 1983). "It is apparent, then, that before the need for an exclusion arises, there must first be coverage within the defined scope of the policy." *McMahon* v. *Boston Old Colony Ins. Co.*, 67 App. Div. 2d 757, 758, 412 N.Y.S.2d 465 (1979). Thus, before the exclusion, "medical or surgical treatment" in Part I can be applied, there must first be coverage under Part I of the policy. As previously noted, Part I provides lifetime disability benefits for total disability caused by an accident. Therefore, the exclusionary provision, "medical or surgical treatment," eliminates from lifetime disability benefits "accidents" caused by or resulting from "medical or surgical treatment." See *Whetsell* v. *Mutual Life Ins. Co. of New York,* supra, 957.

This interpretation of the exclusion does not include "all medical or surgical treatment, no matter how skillfully or unskillfully performed" as the plaintiff has suggested. In order for the exclusion to apply, there must first be an "accident." If the "accident" was caused by or resulted from "medical or surgical treatment," then the insured is limited to disability benefits provided for in the "sickness" provision, i.e., two years. According to the language of the policy, if medical treatment was properly performed or "skillfully" performed, without unforeseen consequences, there would

not be an "accident" caused by "medical or surgical treatment," and thus the exclusion would not apply. One court has said: "[Total Disability] must be caused by an accident before the [lifetime disability] benefits of the policy come into play. An accident is an unintended occurrence. If such happens during medical treatment, it is still an accident, but it is not a risk assumed by the insurance company under the terms of the policy." *Whetsell* v. *Mutual Life Ins. Co. of New York,* supra; see also *Pickard* v. *Transamerica Occidental Life Ins. Co.,* 663 F. Sup. 126, 127 (E.D. Mich 1987); *Reid* v. *Aetna Life Ins. Co.,* 440 F. Sup. 1182, 1183 (S.D. Ill. 1977), aff'd, 588 F.2d 835 (7th Cir. 1978); *Bracey* v. *Metropolitan Life Ins. Co.,* 54 Misc. 2d 175, 180, 282 N.Y.S.2d 121 (1967). The only reasonable interpretation of the exclusionary provision is that it specifically excludes from lifetime disability benefits accidents caused by or resulting from "medical or surgical treatment" causing total disability. Thus, the trial court did not err in finding the exclusionary provision, "medical or surgical treatment," unambiguous.

The plaintiff contends, however, that this interpretation is inconsistent with the reasonable expectations of an insured. He asserts that an insured would not expect the exclusion to encompass improper "medical or surgical treatment" but rather only complications arising from proper treatment. He maintains that the risks attendant with proper treatment, not improper treatment, are the risks a reasonable person would import to those terms. There is no question raised in this case as to whether the plaintiff's total disability was caused by an accident, i.e., improper or negligent medical treatment. The insurance policy does not, however, provide lifetime disability benefits for all accidents causing total disability. The exclusionary provision excludes not only accidents resulting from or caused by "disease or medical or surgical treatment therefor," but also "infection other than pus-forming infection sus-

tained through an accidental cut or wound" and "hernia of any kind, however caused." "These were obviously inserted for the purpose of withdrawing from the coverage certain specific risks." *O'Brien* v. *John Hancock Mutual Life Ins. Co.,* 143 Conn. 25, 28, 119 A.2d 329 (1955). Moreover, although the policy excludes these risks from lifetime disability benefits, it provides benefits for such risks for two years under the "sickness" provision.

"The average policyholder could not reasonably reach a conclusion of coverage in the particular circumstances here 'in the light of and having in mind the language of the . . . [exclusionary provision].' *Harris* v. *John Hancock Mutual Life Insurance Co.,* [41 N.J. 565, 568, 197 A.2d 863 (1964)]. Adoption of the plaintiff's contention in the light of the . . . language of the [exclusionary provision] here would 'render meaningless the words by which the parties expressed their bargain' and read into the contract something which is not there." *Dinkowitz* v. *Prudential Ins. Co.,* 90 N.J. Super. 181, 189, 216 A.2d 613 (1966). When the language of the policy is clear and unambiguous, the court is bound to apply the natural and ordinary meaning of the words employed. See *Schultz* v. *Hartford Fire Ins. Co.,* supra. A court cannot rewrite the policy of insurance or read into the insurance contract that which is not there. See *Fidelity Trust Co.* v. *BVD Associates,* 196 Conn. 270, 282, 492 A.2d 180 (1985). "[T]he liability of the insurer is not to be extended beyond the express terms of the contract." *Plainville* v. *Travelers Indemnity Co.,* supra, 675. Therefore, given the natural and ordinary meaning, the policy expresses the reasonable expectations of the parties. *General Construction Co.* v. *Aetna Casualty & Surety Co.,* 151 Conn. 684, 686, 202 A.2d 146 (1964). We, therefore, cannot accept the plaintiff's claims concerning reasonable expectations.

The plaintiff next contends that the trial court erred in relying on *Whetsell* v. *Mutual Life Ins. Co. of New*

*York,* supra. He maintains that *Whetsell* is "poor logic." He asserts that a "serious flaw in the *Whetsell* decision is its rationale that the exclusionary provision would be rendered meaningless if it did not apply to medical malpractice." He contends that this rationale is based on the following incorrect assumption: "Since all deaths caused by medical treatment necessarily involve mistreatment, to say that mistreatment is not covered by the exclusion is to say that the provision excludes nothing." Id., 957. We do not agree.

In *Whetsell* v. *Mutual Life Ins. Co. of New York,* supra, 956, the plaintiff brought an action against the defendant, claiming that she was entitled to double indemnity for accidental death under the life insurance policies issued by the defendant on the life of her husband. The plaintiff's husband, while in the hospital recovering from cataract surgery, was intravenously given a saline solution. Id. An infected intravenous needle was used, however, causing the decedent to contract bacterial endocarditis from which he died. The insurance policy under which the decedent was insured provided for accidental death benefits if the death occurred "(a) directly and independently of all other causes, as a result of accidental bodily injuries . . . (c) from a cause not mentioned under 'Risks Not Assumed.' " Id. The policy provided under "Risks not Assumed" that the company is not liable for *"death caused or contributed to, directly or indirectly, by disease, by bodily or mental infirmity, or by treatment or operation for disease or bodily or mental infirmity."* (Emphasis in original.) Id.

Prior to deciding whether the above provision excluded from coverage death caused by medical mistreatment, the *Whetsell* court noted that "every court that has considered similar exclusionary clauses has held such provisions to exclude from coverage death caused by various mishaps occurring during the course

of medical treatment."[6] Id. In particular, the court stated that the case most similar to the facts presented to it was *Reid* v. *Aetna Life Ins. Co.*, supra. In *Reid,* the court held that death caused by a poison that was inadvertently substituted for a saline solution fell within the exclusionary provision excluding accidental death benefits coverage for death " 'caused or contributed to by, or as a consequence of . . . medical or surgical treatment.' " Id., 957. In *Whetsell,* the court noted that "to come to a conclusion different from that of the *Reid* court would render the exclusionary provision meaningless. Death is never caused by medical treatment absent some misdiagnosis or mistake. Though death may result where proper medical treatment is unsuccessful, death in those cases is caused by the pre-existing infirmity, not medical treatment. Since all deaths caused by medical treatment necessarily involve mistreatment, to say that mistreatment is not covered

---

[6] The plaintiff further contends, in an attempt to discredit *Whetsell* v. *Mutual Life Ins. Co. of New York,* 669 F.2d 955 (4th Cir. 1982), and the trial court's reliance on *Whetsell,* that the cases cited in footnote 1 of the *Whetsell* decision do not support the trial court's holding in this case. He maintains that only two of the cases deal with improper treatment. The rest of the cases, he contends, deal with unusual reactions or complications arising during the course of proper treatment.

We are unpersuaded by the plaintiff's analysis of the cases cited in the footnote of the *Whetsell* decision. We will not, however, embark on the task of presenting and analyzing each of the twelve cases cited in the footnote as the plaintiff and the defendant have attempted to do in their briefs. We do note, however, that several of those cases cited indicate that before the courts applied the exclusion of "medical or surgical treatment," they first found that the decedent's death was caused by an accident, although the courts did not engage in much discussion or analysis as to the cause of the accident. See *Barkerding* v. *Aetna Life Ins. Co.,* 82 F.2d 358 (5th Cir. 1936); *McKay* v. *Banker's Life Co.,* 187 N.W.2d 736 (Iowa 1971); *Pitman* v. *Commercial Travellers Eastern Accident Assn.,* 284 Mass. 467, 188 N.E. 241 (1930); *Century Indemnity Co.* v. *Carroll,* 126 Tex. 214, 86 S.W.2d 1083 (1935). One case cited in footnote 1 of *Whetsell* applied the exclusion of medical or surgical treatment without a finding that the injury was caused by an accident because the exclusionary provision did not require the initial finding of an accident unlike the policy presented in the present case. See *Order of United Commercial Travelers* v. *Shane,* 64 F.2d 55 (8th Cir. 1933).

by the exclusion is to say that the provision excludes nothing." Id. The court further noted that: "Death must be caused by an accident before the accidental death benefits of the policy come into play. An accident is an unintended occurrence. If such happens during medical treatment, it is still an accident, but it is not a risk assumed by the insurance company under the terms of the policy. The use of an infected I.V. needle was not intended, therefore, it was an accident. However, this occurred as a part of medical treatment, so it is excluded by the clear language of the policy." Id.

It is clear that the plaintiff has isolated a part of the court's rationale in arguing that *Whetsell* is "poor logic." The court's reasoning that the exclusionary provision would be rendered meaningless if it did not apply to "mistreatment" is based on the clear language of the policy. Id. The insurance policy involved in *Whetsell* provided double recovery in the event of accidental death. The policy specifically excluded, however, accidental "death caused . . . by treatment." The court reasoned that if the exclusion did not apply to an accident that occurred during medical treatment resulting in the death of the insured, it would exclude nothing. If there was no accident during treatment, then there would not be coverage for accidental death and, thus, the exclusion would not be triggered. The court then, applying the facts to the exclusion, found the insured's death to have been an accident that occurred during medical treatment, on the basis of the "clear language of the policy," denied the plaintiff double recovery for accidental death. Contrary to the plaintiff's contention, we conclude that the decision in *Whetsell* is based on sound logic.

Moreover, in accordance with the reasoning in *Whetsell,* if the exclusion in the present case, "medical or surgical treatment," did not apply to improper treatment resulting in an "accident," we conclude that it would "exclude nothing." The exclusionary provision in the

present case, as already noted, is encompassed within Part I of the "Benefits" section of the policy. The exclusion specifically excludes accidents caused by medical or surgical treatment. As one court noted: "[A] construction of an exclusion clause which merely exclude[s] losses that . . . [are] not the proximate result of an insured risk would be meaningless because there could be no liability for such losses in the absence of an exclusion." *Commercial Standard Ins. Co.* v. *Gilmore, Gardner & Kirk Oil Co.*, 157 F.2d 929, 931–32, (10th Cir. 1946). In other words, if the exclusion does not exclude a risk that is covered in the policy, it is meaningless. Therefore, if the exclusion does not apply to total disability caused by an *accident* that occurred during medical or surgical treatment, it would be rendered meaningless. " 'Every provision is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it.' *Downs* v. *National Casualty Co.*, [146 Conn. 490, 495, 152 A.2d 316 (1959)]." *Schultz* v. *Hartford Fire Ins. Co.*, supra, 706.[7]

---

[7] In addition, the plaintiff contends that *Whetsell* v. *Mutual Life Ins. Co. of New York*, 669 F.2d 955 (4th Cir. 1982), is poor history. He asserts that "[e]arlier in the century, it appears to have been common for accident policies to exclude coverage unless the injuries were caused by 'accidental means.' " He then cites several cases that discuss the difference between "accidental means" and "accidental results." He declares that "[i]nsurance companies apparently became concerned that the phrase 'accidental means' was spawning too much conflict among the courts, for beginning in the 1960's the language found in the present policy starts appearing in litigation in lieu of the phrase 'accidental means.' " Thus, the plaintiff asserts, "a sensible historical interpretation of the present language is that its purpose was to insure to the extent possible" that accident coverage would be denied for injuries that were unusual or unexpected. We do not agree.

We note that the plaintiff has failed to cite authority for this "historical interpretation" and "purpose" of the exclusionary provision involved in this case. In addition, we point out that the words "medical and surgical treatment" have been cited in cases as part of an exclusion in an insurance policy since at least the 1930s, contrary to the plaintiff's statement

Further, we note that since *Whetsell* has been decided, several courts have relied on *Whetsell* and have applied similar reasoning. *Pickard* v. *Transamerica Occidental Life Ins. Co.,* 663 F. Sup. 126 (E.D. Mich. 1987); *Krane* v. *Aetna Life Ins. Co.,* 698 F. Sup. 220 (D. Colo. 1988); *Castorena* v. *Colonial Life & Accident Ins. Co.,* 107 N.M. 460, 760 P.2d 152 (1988); see also *Simmons* v. *Provident Mutual Life Ins. Co. of Philadelphia,* 496 So. 2d 243 (Fla. App. 1986); *Cheney* v. *Bell National Life Ins. Co.,* 315 Md. 761, 556 A.2d 1135 (1989); *Beveridge* v. *Hartford Accident & Indemnity Co.,* 95 Or. App. 658, 770 P.2d 943 (1989).

We, therefore, do not agree with the plaintiff's attack on *Whetsell.*

There is no error.

In this opinion the other justices concurred.

that this language began to appear in insurance policies in the 1960s. See *Barkerding* v. *Aetna Life Ins. Co.,* 82 F.2d 358 (5th Cir. 1936); *Order of United Commercial Travelers* v. *Shane,* 64 F.2d 55 (8th Cir. 1933); *Pitman* v. *Commercial Traveller's Eastern Accident Assn.,* 284 Mass. 467, 188 N.E. 241 (1930); *New Amsterdam Casualty Co.* v. *Perryman,* 162 Miss. 864, 140 So. 342 (1932); *Century Indemnity Co.* v. *Carroll,* 126 Tex. 214, 86 S.W.2d 1083 (1935). Thus, it does not appear that the purpose of the exclusion, medical or surgical treatment, was, as the plaintiff contends, in response to the conflict concerning accidental means and accidental results.