[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION CROSS MOTIONS FOR SUMMARY JUDGMENT
The plaintiff, Schilberg Integrated Metals Corporation ("Schilberg"), has filed a Motion for Summary Judgment as to liability only and the defendants, Continental Casualty Company, Transportation Insurance Company and Valley Forge Insurance Company (collectively, "CNA"), have filed a dispositive Motion for Summary Judgment in this case in which the Amended Complaint dated January 18, 2000 alleges in Count One that CNA breached contractual obligations to Schilberg under various insurance policies when it refused to defend and indemnify Schilberg in an administrative action brought by the Pennsylvania Department of Environmental Protection ("PADEP") which sought to recover from Schilberg as a result of a release of hazardous substances at a property in Pennsylvania. Count Two of the Complaint seeks a declaratory judgment that CNA has a duty to defend and indemnify Schilberg.
Statement of Facts
This litigation arises out of a dispute with regard to whether CNA was obligated to defend and/or indemnify Schilberg with regard to claims made by PADEP for the remediation of pollution at a site located in Lackawaxen, Pennsylvania ("the site"). For many years, Schilberg "was a generator of much of the waste unlawfully processed and disposed at the site." As such, Schilberg had substantial connection to the operation of"an unpermitted scrap, wire and metal reclamation and waste disposal facility at the site" that had existed "at least from the late 1960's until approximately 1989. . . ." PADEP Second Am. Compl., ¶¶ 11, 13.
Schilberg "began arranging for treatment and disposal of waste containing hazardous substances at the site with Phillip Cardinale" as early as 1981. Then, as part of its regular business practice, Schilberg "arrang[ed] for treatment and disposal of waste containing hazardous substances . . . with Anthony Cardinale after 1984[,] [which] continued until 1986." Additionally, there were times when Schilberg would arrange for the shipment of waste materials to the site with "Crown Recycling 
Recovery, Inc.," which was apparently an alter ego of Anthony Cardinale and/or Phillip Cardinale. PADEP Second Am. Compl., ¶¶ 21-23. PADEP Second Amended Complaint further alleged:
 13. For several years, and at least from the late 1960's until approximately 1989, the owner/operator defendants [including the Cardinales and Crown CT Page 5350 Recycling Recovery, Inc.] maintained an unpermitted scrap, wire and metal reclamation and waste disposal facility at the site.
 27. The metal salvage operation involved the open burning of electrical paraphernalia to recover salvageable metals, mostly copper.
 30. Much of the materials that were brought to the site and unlawfully disposed originated with and was generated by each of the various generator defendants [including Schilberg].
 37. Defendant, [Schilberg], is a scrap copper processor specializing in metal recovery from insulated wire.
 38. [Schilberg] began doing business with the owner/operator defendants in December 1981.
 39. [Schilberg] had arranged for Phillip Cardinale and Crown Recycling Recovery, Inc. and Anthony Cardinale to pick up and process insulated wire from [Schilberg's] Connecticut facility.
 40. After performing unlawful processing, burning of the insulation from the wires which resulted in the release of hazardous substances at the site, the owner/operators were to return the copper from the wires to [Schilberg] for a fee.
The acts described in PADEP's Amended Complaint caused a substantial amount of environmental contamination at the site. PADEP sought to hold Schilberg strictly liable for Schilberg's violations of state law. PADEP claimed reimbursement for the remediation activities that it performed at the site.
Schilberg first notified CNA of the PADEP action in February 1993. CNA issued an initial denial letter on May 14, 1993. In this letter, CNA denied coverage because the reimbursement costs sought by PADEP in the underlying action did not constitute property damage caused by an occurrence within the applicable policy periods. Additionally, as to the policies effective from October 1, 1977 to October 1, 1986, CNA denied coverage under exclusion (f), which precludes coverage for liability arising out of the discharge of pollutants that is not "sudden and accidental." As to the policies effective October 1, 1986 to October 1, CT Page 5351 1990, CNA denied coverage in reliance upon an "absolute pollution exclusion." Finally, for the policies effective from October 1, 1990 to October 1, 1993, CNA denied coverage, relying upon exclusion G-16254A, a similar pollution exclusion. After the denial, Schilberg defended itself in the PADEP claim. Ultimately, it settled with PADEP in July 1999.
Schilberg alleges that from October 1, 1982 through October 1, 1986 one or more of the CNA companies issued it insurance policies for comprehensive general liability, umbrella liability, and excess third party liability.
Discussion of Law and Ruling
Practice Book § 17-49 (formerly § 384) provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Connecticut Bank Trust Co. v. Carriage Lane Associates,219 Conn. 772, 780-81, 595 A.2d 334 (1991); Lees v. Middlesex Ins. Co.,219 Conn. 644, 650, 594 A.2d 952 (1991). Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact; D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434,429 A.2d 908 (1980); a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact, together with the evidence disclosing the existence of such an issue. Practice Book §§ 17-45, 17-46; Burns v. Hartford Hospital,192 Conn. 451, 455, 472 A.2d 1257 (1984). In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmovmg party. Town Bank Trust Co. v. Benson,176 Conn. 304, 309, 407 A.2d 971 (1978); Strada v. ConnecticutNewspapers, Inc., 193 Conn. 313, 317, 477 A.2d 1005 (1984). The test is whether a party would be entitled to a directed verdict on the same facts. Batick v. Seymour, 186 Conn. 632, 647, 443 A.2d 471 (1982); NewMilford Savings Bank v. Roina, 38 Conn. App. 240, 243-44, 659 A.2d 1226
(1995).
Summary judgment should only be granted if the pleadings, affidavits and other proof submitted demonstrate that there is no genuine issue as to any material fact. Scinto v. Stam, 224 Conn. 524, 530, cert. denied,114 S.Ct. 176, 126 L.Ed.2d 136 (1993); Connell v. Colwell, 214 Conn. 242,246, 571 A.2d 116 (1991). summary judgment is "designed to eliminate the delay and expense of litigating an issue where there is no real issue to be tried." Wilson v. City of New Haven, 213 Conn. 277, 279, 567 A.2d 829
(1989).
An insurer does not owe a duty to defend its insured simply because the CT Page 5352 insured has filed a claim or been sued. Rather, an insurer's duty to defend only arises when the suit against the insured states an injury that is "covered" by the terms of the contract. Keithan v. MassachusettsBonding Ins. Co., 159 Conn. 128, 139, 267 A.2d 660 (1970). In order to evaluate whether a suit gives rise to a duty to defend, the four corners of the complaint must be examined to see if it "appears on its face" to be within the coverage afforded. LaBonte v. Federal Mut. Ins. Co.,159 Conn. 252, 255, 268 A.2d 663 (1970); Schurgast v. Schumann,156 Conn. 471, 489, 242 A.2d 695 (1968).
Connecticut law requires courts to effectuate the intentions of the parties as they are expressed in the contract.
 An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy. . . . If the words in the policy are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than evidently intended by the parties. (Citations omitted; internal quotation marks omitted.)
Hammer v. Lumberman's Mut. Cas. Co., 214 Conn. 573, 583-84, 573 A.2d 699
(1990); see 24 Leggett Street Ltd. Partnership v. Beacon Indus., Inc.,239 Conn. 284, 295 (1996).
In addition, "[t]here is no presumption that language in insurance contracts is inherently ambiguous. Only if the language manifests some ambiguity do we apply the rule that ambiguous insurance contracts are to be construed in favor of insureds and to provide coverage." (Citations omitted.) McGlinchey v. Aetna Cas. Sur. Co., 224 Conn. 133, 137,617 A.2d 445 (1992). "[A]ny ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. (Emphasis added.) Tremaine v. Tremaine,235 Conn. 45, 57, 663 A.2d 387 (1995). "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) Stephan v. Pennsylvania Gen. Ins. Co.,224 Conn. 758, 763-64, 621 A.2d 258 (1993). CT Page 5353
Finally, courts must read all provisions of an agreement together, interpreting it so as to give each provision its intended effect. "When interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. See Tremaine v. Tremaine, supra, 235 Conn. at 57; Ceci v. National IndemCo., 225 Conn. 837. 843, 662 A.2d 545 (1993); Board of Educ. v. State Bdof Labor Relations, 217 Conn. 110, 116, 584 A.2d 1172 (1991)." O'Brienv. US. Fidelity Guar. Co., 235 Conn. 837, 843, 669 A.2d 1221 (1996). Courts should not isolate individual words or phrases or read them out of context. "Our Supreme Court has frowned on interpreting a contract in a way that renders a clause in the contract mere surplusage and inoperative. Patron v. Konover, 35 Conn. App. 504, 518, 646 A.2d 90, certdenied, 231 Conn. 929, 648 A.2d 879 (1994), citing A.M Larson Co., Inc.v. Lawlor Ins. Agency, 153 Conn. 621, 220 A.2d 32 (1966) and Weil v.Beresth, 154 Conn. 12, 19, 220 A.2d 456 (1966).
The majority of the CNA policies at issue contain the "sudden and accidental" exclusion for pollution related liabilities. In pertinent part, the policies provide that there is no coverage for:
 bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
There are two aspects to the exclusion. The first clause of the exclusion eliminates coverage if the claims against the insured arise out of the release or discharge of pollutants. CNA has the burden of proving the applicability of any policy provision that would eliminate coverage, including the pollution exclusion.
In Connecticut, the insurer must prove "with a high degree of certainty" that the exclusion clause is applicable. Kelly v. Figueiredo,223 Conn. 31, 37, 610 A.2d 1296 (1992). Where the language of the underlying complaint establishes the applicability of the pollution exclusion, the insured cannot defeat a summary judgment merely by claiming that some tortured interpretation of the language might fit within the "sudden and accidental" exception to the exclusion. "[W]e will not hypothesize or imagine episodes or events that cannot be found among the allegations, and cannot reasonably be deduced from them." StamfordCT Page 5354Wallpaper, Inc. v. TIG Insurance, 138 F.3d 75, 81, (2d. Cir. 1998);Community Action For Greater Middlesex County, Inc. v. American AllianceInsurance Company, 254 Conn. 387, 757 A.2d 1074 (2000) (Connecticut Supreme Court concluded that allegations of the underlying complaintreasonably fell within policy exclusion). The second clause sets forth an exception to the scope of the first clause, reinstating coverage if the release or discharge was "sudden and accidental."
The parties disagree as to whether the insured or the insurer bears the burden of proving application of the sudden and accidental exception. Although Connecticut has not decided this precise issue,[1] a majority of courts place the burden of proving the sudden and accidental exception to the pollution exclusion clause on the insured. See E.I. DuPont v.Allstate Ins. Co., 693 A.2d 1059 (Delaware 1997); Aeroquip Corp. v. AetnaCas. Sur. Co., 26 F.3d 893, 895 (9th Cir. 1994) (California law);St. Paul Fire Marine Ins. Co. v. Warwick Dyeing Corp., 26 F.3d 1195,1200 (1st Cir. 1994) (Rhode Island law); Park-Ohio Indus., Inc. v. HomeIndem. Co., 975 F.2d 1215 (6th Cir. 1992); A. Johnson Co., Inc. v.Aetna Cas. Sur. Co., 741 F. Sup. 298 (D.Mass. 1990), aff'd, 933 F.2d 66
(1st Cir. 1991) (Maine law); American Mut. Liability Ins. Co. v. BeatriceCo., Inc., 924 F. Sup. 861. 878 (N.D.Ill. 1996); Quaker StateMinit-Lube, Inc. v. Fireman's Fund Ins. Co., 868 F. Sup. 1278, 1312 (D. Utah 1994), aff'd, 52 F.3d 1522 (10th Cir. 1995); Cooper Dev. Co. v.Employers Ins. of Wausau, 765 F. Sup. 1429, 1431 (N.D.Cal. 1991);Hudson Ins. Co. v. Double D Management Co., Inc., 768 F. Sup. 1549, 1551
(M.D.Fla. 1991); Northern Ins. Co. of N.Y. v. Aardvark Assoc., Inc.,743 F. Sup. 379, 381 (W.D.Pa. 1990), aff'd, 942 F.2d 189 (3d Cir. 1991); Employers Ins. Co. v. Petroleum Specialties, Inc., 69 F.3d 98, 99
(6th Cir. 1995) (Michigan law); Fischer Porter Co. v. Liberty Mut.Ins. Co., 656 F. Sup. 132, 140 (E.D.Pa. 1986); SCSC Corp. v. AlliedMut. Ins. Co., 536 N.W.2d 305, 311 (Minn. 1995); US. Inds., Inc. v.Insurance Co. of N.A., 674 N.E.2d 414 (Ohio Ct.App. 1996); SyndergeneralCorp. v. Great Am. Ins. Co., 928 F. Sup. 674 (N.D.Tex. 1996).
The party who stands to benefit by the application of a contract term has the burden of proving it. 19 Couch on Insurance 2d, § 79:385 (2d rev. ed. 1983). Whereas it is the insurer's burden to prove the applicability of a coverage-defeating exclusion, it is the policyholder's burden to prove the applicability of an exception to the exclusion that has the effect of reinstating coverage. "Shifting the burden to establish the exception conforms with an insured's general duty to establish coverage where it would otherwise not exist, provides the insured with an incentive to strive for early detection that it is releasing pollutants into the environment and appropriately places the burden of proof on the party having the better and earlier access to the actual facts and circumstances. . . ." Northville Indus. Corp. v. National Union FireCT Page 5355Insurance Co., 679 N.E.2d 1044, 1049 (N.Y. 1997); accord, HighlandsInsurance Co. v. Aerovox, Inc., 676 N.E.2d 801 (Mass. 1997).
 The allocation of the burden of proof is made on the basis of one or more of several variable factors. It is said that the burden properly rests upon the party who must establish the affirmative proposition, to whose case the fact in question is essential, who has the burden of pleading a fact, who has readier access to knowledge about the fact, or whose contention departs from what would be expected in the light of everyday experience. James Hazard, Civ. Proc. (2d ed.) 7, 8.
Albert Mendel Son, Inc. v. Krogh, 4 Conn. App. 117, 124 n. 6, 492 A.2d 536
(1985).
Because the "sudden and accidental" exception creates coverage where none would otherwise exist, the insured's burden of proving coverage extends to this exception. Such an allocation makes sense, as it "aligns the burden with the benefit." Aeroquip Corp. v. Aetna Cas. Sur. Co., supra, 26 F.3d at 895.
This distribution is also consistent with the usual rule of placing the burden on the party who has access to the salient facts. Albert Mendel Son, Inc. v. Krogh, supra, 4 Conn. App. at 124-25. An insured is more likely to possess the information pertaining to its waste handling and disposal activities, particularly when, as is true in this case, such disposal occurred at sites known to the insured and not the insurer. SeeSCSC Corp. v. Allied Mut. Ins. Co., 536 N.W.2d 305 (Minn. 1995). It would be unfair to impose the burden of producing such evidence on the insurer, who was a stranger to these activities. In addition, if the burden were placed on the insurer, the insured would have the incentive to remain ignorant about the causes of any of its releases or discharges in order to increase the possibility of coverage.
It is the insured's burden to come forward with evidence that the allegations against it are based upon discharges that are both "sudden and accidental."
This court's analysis must begin with the terms of the subject insurance contracts. The majority of the CNA policies at issue contain the "sudden and accidental" exclusion for pollution related liabilities. In pertinent part, the policies provide that there is no coverage for:
 bodily injury or property damage arising out of the CT Page 5356 discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
There are two aspects to the exclusion. The first clause of the exclusion eliminates coverage if the claims against the insured arise out of the release or discharge of pollutants. As discussed above, the insurer bears the burden of proving the applicability of the main body of the exclusion, that is, the insured's liability is for bodily injury or property damage arising out of the discharge of pollutants. The second clause sets forth an exception to the scope of the first clause, reinstating coverage if the release or discharge was "sudden and accidental." The insured carries the burden of proof with regard to this exception.
On its face, the pollution exclusion is clear and unambiguous. See,e.g. Heyman Assoc. No. 1 v. Insurance Co. of Pennsylvania, 231 Conn. 756,779, 653 A.2d 122 (1995) (absolute exclusion not ambiguous). It excludes coverage for all claims arising out of pollution-related activities; no matter what the insured's role — generator, broker, transporter or a site owner. "[T]he language of the exclusion focuses on the nature of the property damage. . . . it does not specify the manner in which such discharge is carried out, or that it be executed by" the insured directly. Stamford Wallpaper, Inc. v. TIG Insurance, 138 F.3d 75, 80, (2d. Cir. 1998).
"Release" is defined in the Pennsylvania Hazardous Cleanup Act ("HSCA") as meaning "[s]pilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposal into the environment. The term includes abandonment or discarding of barrels, containers, vessels and other receptacles containing a hazardous substance or contaminant." 35 P.S. § 6020.103. See also CERCLA definition. 42 U.S.C. § 9601 (22). Similarly, "disposal" is defined as "[t]he incineration, combustion, evaporation, air stripping, deposition, injection, dumping, spilling, leaking, mixing or placing of a hazardous substance or contaminant into the air, water or land in a manner which allows it to enter the environment."35 P.S. § 6020.103. Hence, under these HSCA definitions, the act of arranging clearly falls within the pollution exclusion. See Stamford Wallpaper,supra, 138 F.3d at 80 (holding that arranging falls within CERCLA definition of release and disposal). CT Page 5357
CNA is obligated to examine the complaint to see if it contains: 1) allegations that hazardous wastes were released at the site and 2) that property damage occurred.
The second amended complaint in Commonwealth of Pennsylvania,Department of Environmental Resources v. Crown Recycling Recovery,Inc., et al., alleges that the site was contaminated and that Schilberg contributed to the contamination:
 1. This complaint requests that the Department be reimbursed for costs it incurred in performing an interim response action at the Crown Industries site located in Lackawaxen Township, Pike County. The Department took action, pursuant to section 501 (a) and 505(b) of the Hazardous Sites Cleanup Act, 35. P.S. §§ 6020.501(a) and 6020.505(b), to respond to a release of contaminants and/or hazardous substances which the Department deemed necessary to protect public health, and safety and the environment. (Emphasis added).
 11. Defendant, Schilberg Integrated Metals Corp., (SIMCO). is a Connecticut Corporation with an address of 47 Milk Street, Willimantic, Connecticut 06226. SIMCO was a generator of much of the waste unlawfully processed and disposed at the site. (Emphasis added).
 44. As a result of the site investigations and soil and water samplings conducted over the years, it was found that the site was contaminated with ash containing high levels of lead; PCB's have been detected in the soil, water and creek sediments, polycyclic aromatic hydrocarbons (PAHs) have been found in on-site soil samples; dioxin has been found in soil at the site; and tetrachloroethylene (PCE) has been found in five residential wells which are situated around the site. (Emphasis added).
The plain language of the complaint alleges that hazardous substances and pollutants were disposed of which caused harm to the environment. Such discharges or releases which result in property damage fall squarely within the definition of the pollution exclusion. Based on the foregoing language it appears with a high degree of certainty, that the pollution CT Page 5358 exclusion precludes coverage for Schilberg's claims.
Every Connecticut court that has considered the term "sudden" within the context of the relevant pollution exclusion has held that "sudden" has a temporal meaning under Connecticut law and necessarily refers to a rapid or abrupt event. Buell Industries, Inc. v. Greater New York MutualIns. Co., 2000 WL 1337471 (Conn.Super. 2000, Koletsky, J.); Zero-Max,Inc. v. Liberty Mutual Insurance Co., 1999 WL 1246922 (Conn.Super. 1999, Nadeau, J.); Reichhold Chemicals, Inc. v. Hartford Accident Indemnity Co., 1998 WL 811592 (Conn.Super. 1998. Aurigemma, J.), reversed on other grounds 252 Conn. 774 (2000); Linemaster Switch Corp.v. Aetna Life Casualty Co., 1995 WL 462270 (Conn.Super. 1995, Corradino, J.); Carrier Corp. v. Home Insurance Co., 1994 WL 547736 (Conn.Super. 1994, O'Neill, J.). Local federal courts have reached the same conclusion. Stamford Wallpaper Co., Inc. v. TIG Insurance, 138 F.3d 75
(2d Cir. 1998) [applying Connecticut law]; Edo v. Newark Insurance Co.878 F. Sup. 366 (D.Conn. 1995).
A majority of state supreme courts have held that the "sudden and accidental" exception is unambiguous and should be accorded its ordinary temporal meaning.[2] In other states, both intermediate appellate and federal courts[3] have defined the term "sudden" to imply a temporal element. To be considered "sudden," a release or discharge must occur abruptly, quickly, over a short period of time. Linemaster Switch Corp.v. Aetna Life Casualty Co., supra. Indeed, one Connecticut Superior Court judge, in recognizing the temporal aspect of "sudden, "likened it to a "boxer's punch." Carrier Corp. v. Home Ins. Co., supra, at 1.
The term "accidental" has been defined as "unintentional" or "unexpected." Linemaster Switch Corp. v. Aetna Life Casualty Co.,supra. The "sudden and accidental" exception exclusion is expressed in the conjunctive. It can only be invoked when the discharges are both
"sudden" and "accidental." Edo v. Newark Ins. Co., supra, at 373;Technicon Elec. Corp. v. American Home Assur. Co., 74 N.Y.2d 66, 75,544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989). This is consistent with fundamental contract law that every provision of a contract, including an insurance policy, should be given effect and not disregarded. A. M LarsonCo. v. Lawlor Ins. Agency, Inc., 153 Conn. 618, 621-622, 220 A.2d 32
(1966). "[I]f sudden were not accorded a temporal meaning, that is, if it were deemed to mean only `unexpected,' then the word `accidental' would in essence be rendered superfluous." Edo, supra, at 373. See alsoLinemaster, supra.
Pollution that occurs gradually or over an extended period of time is not sudden. Linemaster, supra; Smith v. Hughes Aircraft Co., 22 F.3d 1432,1438 (9th Cir. 1993) (pollution from practice of discharging TCE into CT Page 5359 unlined ponds was not "sudden" on ground that discharges occurred when waste treatment plant broke down or was over capacitated or when TSE was spilled onto work floor, where discharges were pursuant to long term waste practices); Great Lakes Container Corp. v. National Union Fire Ins. Co. ofPittsburgh, PA, 727 F.2d 30, 33-34 (1st Cir. 1984) (finding no "sudden" releases where ground water was contaminated by migration of wastes discharged in regular operation of business); Freedom Gravel Products,Inc. v. Michigan Mut. Ins. Co., 819 F. Sup. 275, 281 (W.D.N.Y. 1993) (allegations that contamination occurred during a three month period precluded any suggestion that the discharges were "sudden"); County ofFulton v. U.S. Fidelity Guar. Co.,195 App.Div.2d 864,600 N.Y.S.2d 972 (3d Dept. 1993) (allegations that wastes dumped over a period of year, are neither "sudden" nor "accidental"). See also Redding-Hunter, Inc. v.Aetna Cas. Sur. Co., 206 App.Div.2d 805, 807, 615 N.Y.S.2d 133 (3d Dept. 1994). Stamford Wallpaper Co., Inc. v. TIG Insurance, 138 F.3d 75, 80 (2d Cir. 1998).
The allegations in the underlying complaint state that Schilberg's wastes were placed at the site as part of its routine business dealings with Phillip and Anthony Cardinale over a span of five years, from 1981 to 1986.
 21. In December of 1981, defendant SIMCO began arranging for treatment and disposal of waste containing hazardous substances at the site with Phillip Cardinale. (Emphasis added).
 22. Defendant SIMCO's business dealings consisting of arranging for the treatment and disposal of waste containing hazardous substances continued with Anthony Cardinale after 1984 and continued until
1986. (Emphasis added).
 23. After 1985, there were occasions in which SIMCO's arrangement for the treatment and disposal of waste containing hazardous substances were arranged with Anthony Cardinale using the name "Crown Recycling Recovery Inc." of New Jersey, and other times with "Tony Cardinale."
The PADEP allegations necessarily limit the cause of the pollution to an ongoing business practice of at least five years. Accordingly, the discharge of pollutants as alleged clearly did not occur "suddenly" or over a short period of time. Nor did it occur "accidentally."
Courts have repeatedly held that the routine practice of arranging for CT Page 5360 the transport and disposal of waste is neither sudden nor accidental. "[D]ischarges which are a concomitant of normal business activities are not `sudden' within the meaning of the exclusion." Redding-Hunter, Inc.v. Aetna Cas. Sur. Co., supra, at 807; St. Paul Fire and MarineInsurance Co. v. Warwick Dyeing Corp., 26 F.3d 1195, 1202 (1st Cir. 1994) (manufacture's use of disposal company does not qualify under exception to pollution exclusion); A. Johnson Co v. Aetna Casualty andSurety Co., supra, 933 F.2d at 75-76. Indeed, the Second Circuit, applying Connecticut law, reached this same conclusion when presented with facts nearly identical to the instant matter. In Stamford Wallpaper,supra, the underlying complaint alleged that the insured had arranged for the disposal of its waste through carters who deposited said waste at off-site locations. The court concluded that these allegations did not support the inference that the property damage arose out of a sudden and accidental event, noting that "[t]here is nothing accidental about such an arrangement, which is characteristic of an ordinary course of business." Id. at 80.
The allegations contained in PADEP's Second Amended Complaint are indistinguishable from those set forth in Stamford Wallpaper. Schilberg is alleged to have arranged for the transport and disposal of its waste via carters as part of its routine business practices for a period of five years between 1981 and 1986. The underlying allegations, therefore, are flatly inconsistent with any inference that the pollution could have been caused by a "sudden" and "accidental" event.
As stated above, it is Schilberg's burden to prove that the pollution alleged in the underlying complaint was "sudden" and "accidental." It has offered no substantive evidence to that effect. Schilberg's response to Interrogatory Number 37 of CNA's first set of interrogatories, set forth below, underscores that fact.
37. Do you contend that the emission, discharge, disposal, dispersal, release, seepage or escape of any irritant, contaminant or pollutant that is the subject of any Claim or underlying action relating to the sites was sudden and accidental? (Emphasis added). If so,
 (a) Identify all facts contentions, statements, documents, applications of law to fact, communications and/or conversations upon which you rely to support your contention; and
 (b) Identify all persons with knowledge of the facts, contentions, applications of law to fact, documents, statements, communications and/or information set forth in the documents identified CT Page 5361 in response to subparagraph (a) hereof.
In pertinent part Schilberg answered as follows:
OBJECTION: SIMCO objects to this interrogatory as vague in that the phrase "emission, discharge, disposal, dispersal, release, seepage or escape" is ambiguous given that the terms "disposal" and "release" are defined terms and in that the phrase "sudden and accidental" is ambiguous in that SIMCO cannot discern whether Defendants are referencing a temporal or scienter condition and/or whether Defendants are attempting to reference particular language in the subject insurance policies. SIMCO further objects to this interrogatory on the grounds that it seeks information to such a degree of detail that it is more appropriately obtained in a deposition. Subject to, and without waiving, the foregoing objections, SIMCO states that nothing in the underlying third-partycomplaint excluded the possibility that the alleged release(s) was suddenand accidental. (Emphasis added).
Schilberg has presented no evidence to support its claim that the pollution was "sudden" and "accidental." Instead, it argues that "sudden and accidental" means "sudden and without the specific intent topollute," However, Stamford Wallpaper makes clear that for an insured to be able to avail itself of the sudden and accidental exception to the pollution exclusion, the discharge of pollutants has to be accidental. Schilberg has also argued that because the second amended complaint of PADEP does not foreclose the possibility that the pollution in question was accidental, the "sudden and accidental" exception to the pollution exclusion should apply. This is similar to the argument unsuccessfully advanced by the insured in Stamford Wallpaper.
The PADEP allegations in this case closely parallel the allegations against the insured in Stamford Wallpaper, 138 F.3d at 79-80, a diversity case applying Connecticut law. In that case, the United States Environmental Protection Agency sent letters to the insured stating "EPA has reason to believe that you arranged by contract, agreement or otherwise for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances found at the site. . . ." Id. When the insured turned the letters over to its insurance carrier and requested that the insurer defend it, the insurer refused. Id. In the subsequent action in which the insured sued its insurer, the insured attempted to claim that because the EPA's letters did not categorically exclude all possibility of a sudden and accidental event, the insurer could not take advantage of the pollution exclusions in refusing to defend the insured. The district court rejected this argument and a unanimous panel of the Second Circuit affirmed. Id. at 81. In rejecting the argument the court held that CT Page 5362
 it may be that a carter's truck suddenly overturned at the site and accidentally spilled its contents here instead of there, or that the pollutants suddenly and accidentally escaped from some containment basin or tank, and reached some of the polluted property by that route. And it may be that such a thing could be alleged; but no allegation in the third-party complaint or the PRP letters gives one a reason to think that such a thing happened.
Id. (Emphasis added).
In this case, Schilberg makes an argument virtually identical to that of the insured in Stamford Wallpaper. Schilberg claims "it is very reasonable to conceive of a scenario wherein not only was there no intent to cause environmental discharges but also wherein an affirmative intent existed to remove all process byproducts from the Site." (Pl.'s Mem. of Law in Support of Mot. for Summ. J., p. 22.) It then constructs a purely hypothetical situation in which any discharges at the site were "sudden and accidental" because the various participants had economic incentives to recover all copper and residual ash from the burning process that went on at the site. (Pl.'s Mem. of Law in Support of Mot. for Summ. J., p. 22-23.) The flaw in this argument is that the Second Amended Complaint in the PADEP action does not even hint that any of these events happened and in support of or opposition to a summary judgment a party must present some evidence, and not merely rely on speculation. Practice Book §17-49.
Schilberg has the burden to prove that the sudden and accidental exception to the pollution exclusion applies. It has presented no evidence that the pollution alleged in the PADEP complaint was sudden and accidental, but instead has resorted to speculation. Moreover, CNA has produced evidence which tends to prove that the sudden and accidental exclusion does not apply. Specifically, it has produced the Adjudication of the Commonwealth of Pennsylvania Environmental Hearing Board in the underlying PADEP action. The Commonwealth of Pennsylvania Environmental Hearing Board found specifically that Schilberg had an arrangement with the operators of the site to ship copper wire to the site. There it was burned and the operators would ship the uninsulated wire back to Schilberg. The burning occurred in a crude concrete pit. The byproduct ash sat exposed on the site for periods of up to one year. Over the course of Schilberg's business dealings with the operators of the site, they burned approximately 1.6 million pounds of Schilberg's wire at the site. The site was on a hill and exposed to wind and weather. Lead, copper, and dioxin were a byproduct of the burning of Schilberg's wire. CT Page 5363 These substances contaminated the site. Adjudication, pp. 13-15.
Moreover, the findings of fact reveal that there was a substantial amount of evidence that Schilberg did act knowingly and intentionally and was aware that its "arrangements" with the operators of the site would cause a substantial amount of environmental contamination at the site.
 Mr. [Bernard] Schilberg's own testimony indicates that he could not have reasonably believed that the Site was an environmentally controlled facility. According to Mr. Schilberg, in 1981 it cost [Schilberg] seven and a half cents per pound of copper wire to operate its Connecticut incinerator facility with pollution controls, including afterburners and a stack. . . . [Schilberg] has since had to cease operating its facility as an incinerator because it became uneconomical to continue to burn lower grade material and is now operating it for processing. [Schilberg] paid the Cardinales four cents per pound of copper wire for their services. . . . [Schilberg] had an arrangement with the Cardinales which required the Cardinales to drive approximately two and a half hours to pick up the insulated wire at [Schilberg's] Connecticut facility, drive approximately two and half hours to the Site, remove the insulation, return the copper reclaimed, and transport the ash to Franklin Smelting in Philadelphia. . . . Since it cost [Schilberg] almost twice as much to operate a pollution controlled facility compared to what it cost to [Schilberg] to pay the Cardinales, [Schilberg] could not have reasonably believed that the Cardinales were processing [Schilberg's] wire in an environmentally sound manner or with the benefit of pollution controls.
(Adjudication, pp. 24-25, emphasis added.) These findings of fact strongly suggest that Schilberg's economic-incentive argument has no basis in fact and that there is no basis in fact for any argument that pollution in question was actually "accidental."
Schilberg's "proof' depends upon the assertion that the absence of something's opposite proves its existence. In other words, Schilberg contends that the pollution was caused by "sudden" and "accidental" events because the underlying complaint does not expressly state to the contrary that the pollution was not "sudden" and "accidental." The Second Circuit Court of Appeals in Stamford Wallpaper, supra at 81, rejected CT Page 5364 this exact argument. "The pollution exclusion would lose all force if it could be defeated by the mere imagining of any sudden accident that is not actually foreclosed by the allegations of the underlying complaint." (Emphasis added). Similarly, our Supreme Court's most recent application of a policy exclusion clause to a coverage dispute confirms that, once the exclusion is determined to be clear and unambiguous, the analysis becomes, not whether the allegations of the underlying complaint exclude every possibility of coverage, but rather, whether the allegations "reasonably may be read to fall within that policy exclusion." CommunityAction For Greater Middlesex County, Inc. v. American Alliance InsuranceCompany, supra 387, 757 A.2d 1074 (2000) (Emphasis added).
The 1986 CGL policy at issue contains the absolute pollution exclusion. Stipulation Re: Discovery ¶ 2. The relevant language excludes:
"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
(a) At or from premises you own, rent or occupy;
 (b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;
 (c) Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or
 (d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:
 (i) if the pollutants are brought on or to the site or location in connection with such operations; or
 (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.
 (2) Any loss, costs, or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants. CT Page 5365
 Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
The allegations contained in PADEP's Second Amended Complaint clearly fall within this exclusion. In Heyman Assoc. No. 1 v. Insurance Co. ofPennsylvania, 231 Conn. 756, 773, 653 A.2d 122 (1995), the Connecticut Supreme Court held that the absolute exclusion is clear and unambiguous.[4] Subsequent Superior Court cases followingHeyman have consistently held that groundwater and soil pollution claims fall within the absolute pollution exclusion.See FJS Corporation v. United National Insurance Company, 1998 WL 144820 (Conn.Super.) (Leheny, J.) (absolute exclusion bars coverage for claim relating to the presence of hazardous materials on property); Thompson v. Merchant's Mutual Ins. Co., 1995 WL 80030 (Conn.Super.) (Pickett, J.) (there is no coverage for claims seeking cleanup costs and damages as a result of insured's alleged contamination of surrounding soil and well contamination).
The allegations of the underlying complaint necessarily fall within the absolute exclusion. Said allegations seek relief for cleanup costs incurred by the state government of Pennsylvania for the remediation of contaminated soil and groundwater. Accordingly, Schilberg's claim is barred under Heyman and its progeny with respect to the 1986 CGL policy.
Schilberg has also argued in support of its Motion for Summary Judgment that has that CNA cannot use the pollution exclusions of the 1981 to 1986 policies as a basis for refusing to defend and indemnify Schilberg because CNA did not obtain regulatory approval of the pollution exclusions from the Connecticut Department of Insurance. This argument is unavailing for two reasons. First, it is procedurally improper. Second, Schilberg has failed to present evidence to support the fact that the pollution exclusions were not approved by the Connecticut Department of Insurance.
As an initial matter, it is procedurally improper for Schilberg to challenge CNA's regulatory compliance in its Motion for Summary Judgment. Connecticut Practice Book § 10-57 states that a "[m]atter in avoidance of affirmative allegations in an answer or counterclaim shall be specially pleaded in the reply." Conn. P.B. § 10-57
(emphasis added). Here, CNA pleaded the pollution exclusions in its Special Defenses. Cf Beckenstein v. Potter Carrier, Inc., 191 Conn. 150,163-64 (1983) (Fraudulent concealment, which is a matter in avoidance of a statute of limitation special defense, must be pleaded affirmatively.)See, e.g., Kerr v. Metropolitan District Comm'n, 1994 Conn. Super. LEXIS CT Page 5366 1178 * 7 (plaintiff could not avoid summary judgment by claiming that the defendant fraudulently concealed the cause of action from the plaintiff when the plaintiff failed to plead fraudulent concealment in avoidance of a statute of limitation special defense). See also Heyman Assoc. No. 1v. Ins. Co. of the State of Penn., 231 Conn. 756, 786-87 (1995) (trial court did not err in denying motion to reopen judgment when the plaintiff improperly raised the defendant/insurer's alleged failure to file a pollution exclusion for the first time in the motion to reopen judgment).
In this case, Schilberg's claim that CNA failed to file the relevant exclusions — just like the fraudulent concealment claim in Kerr
— is a matter in avoidance of a special defense. Thus, if Schilberg wanted to claim that CNA could not take advantage of the pollution exclusions in refusing to defend Schilberg. it had to do so by pleading specially in avoidance of the affirmative allegations in CNA's Answer 
Special Defense. It has not done so. Schilberg's argument is not properly before the Court for the purposes of its Motion for Summary Judgment.
If the court overlooks this procedural deficiency, as a matter of law, Schilberg may not prevail on its argument. Schilberg bears the burden of proof with respect to its allegation that CNA did not file the pollution exclusions with the Connecticut Department of Insurance, since it is a matter in avoidance of an affirmative allegation in an answer. See Conn. P.B. § 10-57.
Schilberg apparently sought discovery from CNA about its regulatory filings, but filed the Motion for Summary Judgment without obtaining the court's ruling as to whether CNA's objections to the discovery requests were valid. Instead, Schilberg apparently filed a Freedom of Information Request with the Insurance Commissioner and learned that the Commissioner did not retain documents pertaining to the pollution exclusion clause which were dated prior to 1992. On the strength of the foregoing, Schilberg bases its argument that CNA failed to file the pollution exclusion clauses with the Connecticut Department of Insurance pursuant to the requirements of Connecticut General Statutes § 38a-676.
In contrast to Schilberg's absence of evidence, CNA has produced evidence which proves that CNA did file the pollution exclusion language with the Insurance Commissioner. This evidence includes the Affidavit made by Waldo R. DiSanto, who was employed at the Connecticut Department of Insurance for 22 years, during the last ten of which he was the Director of Rating. That affidavit establishes that not only was the pollution exclusion filed with the Connecticut Department of Insurance, its meaning and purpose was clear at the time of filing.
For the foregoing reasons, the court finds that as a matter of law, the CT Page 5367 allegations of the underlying PADEP action against Schilberg fell within the pollution exclusion of the relevant insurance policies and the defendants had no duty to defend or indemnify Schilberg. Therefore, the defendants' Motion for Summary Judgment is granted and the plaintiff's Motion for Summary Judgment is denied.
By the court,
Aurigemma, J.